# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| INTERNATIONAL VAN LINES, INC., <br><br> **Plaintiff,** <br><br> v. <br><br> AD PRACTITIONERS, LLC, <br><br> **Defendant.** | CIVIL NO. 20-1726 (PAD) |

## OPINION AND ORDER

Delgado-Hernández, District Judge.

Before the court are plaintiff's "Motion for Preliminary Injunction and Stay of Arbitration" (Docket No. 9); and defendant's "Motion to Compel Arbitration and to Dismiss" (Docket No. 11).[1] The dispute is arbitrable and shall be submitted to arbitration. And because no live controversies will remain here thereafter, the complaint must be dismissed.

## I.     FACTUAL BACKGROUND

Plaintiff, International Van Lines, Inc. ("International") is engaged in the business of carriage and household goods as a carrier and broker (Docket No. 1 at ¶ 12). Also, it offers services to individuals and entities who are moving or relocating by providing door-to-door transportation of its clients' belongings. Id. Defendant, Ad Practitioners, LLC ("AP"), under the trade name "ConsumersAdvocate.org," offers information and recommendations to consumers looking for goods and services in different industries such as insurance, healthcare, finance, software, home, and transportation, among others. Id. at ¶ 14. It generates income by charging companies who

---

[1] Because the issues are intertwined, defendant filed a response to plaintiff's motion for preliminary injunction at Docket No. 12, followed by the motion to compel arbitration and to dismiss the case at Docket No. 11. Plaintiff, in turn, combined its reply and opposition to the motion to compel arbitration in its motion at Docket No. 16, and combined its surreply and reply in the filing at Docket No. 19.

advertise their goods or services on its website for leads and referrals generated through the website. Id.[2] Quoting AP's website, International avers that AP's editorial team does rigorous research and testing so consumers do not have to, and to generate helpful, honest, and accurate information to match the consumer with companies that are best for their specific situation and need. Id. at ¶ 15.

On April 26, 2017, the parties entered into an "Internet Advertising Agreement," to promote International's products and/or services through various websites. Id. at ¶ 16 and Docket No. 1-1, Copy of the Internet Advertising Agreement. According to the Agreement, the details of each specific marketing campaign were going to be set forth in a separate "Insertion Order." Id.[3] Payments were to be made pursuant to Section 4 of the Agreement ("Payment Terms" Section). And, as to claims, Section 9.1 ("Dispute Resolution and Indemnification") provides that:

> All claims arising out of or relating to this Agreement and/or the Services will be resolved by arbitration (and the parties hereby consent to personal jurisdiction) in Dorado, PR, in accord with the Commercial Dispute Resolution Procedures of the American Arbitration Association and the Optional Rules for Emergency Measures of Protection. The arbitration will be decided by a single arbitrator whose decision will be final and binding and may be enforced in any court of competent jurisdiction.

As of October 25, 2019, International acknowledged owing $79,632.50 to AP. So, the parties entered into a "Payment Agreement Contract" whereby International agreed to pay the *outstanding* balance of $79,632.50 – following an agreed upon payment schedule – in exchange for

---

[2] AP owns and manages a portfolio of digital brands that match businesses with consumers across more than 150 categories. It provides internet advertising services through this network of digital brands, as well as various third-party websites (Docket No. 1-3 at ¶ 6).

[3] Throughout the relationship, the parties executed Insertion Orders effective November 1, 2017 (Docket No. 1-1, p. 8 and Docket No. 1-3, p. 19); April 8, 2019 (Docket No. 1-3, p. 21); and October 1, 2019 (Docket No. 1-3, p. 23).

*continued* service as a partner on ConsumersAdvocate.org (Docket No. 1-2, Copy of the Contract).[4] What happened afterwards is disputed. International alleges that it made *all* payments due under the Contract, but that AP breached its obligations and duties by "overbilling" International (Docket No. 1 at ¶ 32). AP, in turn, claims that International failed to make any payments *at all* under the Payment Agreement and that its current outstanding balance for all unpaid invoices adds up to more than $176,000.00 (Docket No. 1-3, p. 4).

On April 2, 2020, AP sent a letter to International demanding full payment of the outstanding balance of $176,133.00 no later than April 25, 2020. Because no payment was made, on or about November 9, 2020, AP sent International a "Demand for Arbitration" alleging breach of the Advertising Agreement for nonpayment of the fees owed and the relevant insertion orders. The demand included factual allegations regarding the history of International's unpaid invoices and failure to make any of the five monthly payments toward its outstanding balance, as agreed in the Payment Agreement (Docket No. 1-3, Copy of the Demand for Arbitration).

International did not respond to the Demand for Arbitration, and, instead, on December 17, 2020, filed a Verified Complaint seeking: (i) declaratory judgment to the effect that it is in compliance with the Payment Agreement Contract and that it has no obligation to arbitrate AP's claims (Docket No. 1, Count I ¶¶ 50-53); (ii) a preliminary injunction staying arbitration (id., Count II ¶¶ 54-60); (iii) a permanent injunction to vacate the arbitration demand (id. Count III ¶¶ 61-65); and (iv) breach of contract and damages for AP's alleged breach of its obligations (id. Count IV ¶¶ 66-68). In turn, AP moved to compel arbitration and to dismiss the complaint (Docket No. 11).

---

[4] The payment schedule included in the Contract provided for five payments of $15,926.50 (due on 10/25/2019, 11/29/2019, 11/27/2019, 1/31/2020, and 2/28/2020, respectively). The parties also agreed that those payments were going to be surrendered to Ad Practitioners "along with current invoices when they are issued." See, Docket No. 1-2. In addition, the Payment Agreement Contract provided that ". . .failure to meet its terms will allow [AP] to take certain recourse." Id.

## II. DISCUSSION

The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), was enacted "to overcome a history of judicial hostility to arbitration agreements." It reflects "the fundamental principle that an agreement to arbitrate is a matter of contract," Escobar-Noble v. Luxury Hotels Int'l of P.R., Inc., 680 F.3d 118, 121 (1st Cir. 2012)(internal citations and quotations omitted), placing arbitration agreements on an equal footing as other contracts by stating that "an agreement in writing to submit to arbitration an existing controversy ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C § 2. Correspondingly, arbitration should not be compelled unless the parties entered into a validly formed and legally enforceable arbitration agreement covering the underlying claims. See, Escobar-Noble, 680 F.3d at 121-122.

Arbitrability depends on whether: (1) a valid arbitration clause exists; (2) the movant is entitled to invoke the clause; (3) the non-moving party is bound by it; and (4) the clause covers the claims asserted. See, Bossé v. New York Life Insurance Company, 992 F.3d 20, 27 (1st Cir. 2021) (articulating test to compel arbitration); Biller v. S-H OpCo Greenwich Bay Manor, LLC, 961 F.3d 502, 508 (1st Cir. 2020)(quoting, Dialysis Access Center, LLC v. RMS Lifeline, Inc., 638 F.3d 367, 375 (1st Cir. 2011))(same). If the party seeking to compel arbitration makes that showing, the court must send the dispute to arbitration "unless the party resisting arbitration specifically challenges the enforceability of the arbitration clause itself ... or claims that the agreement to arbitrate was 'never concluded.'" Biller, 961 F.3d at 508 (quoting, Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 301 (2010)).

There is no question that the record satisfies factors 1, 2, and 3.[5] But, the parties vehemently disagree about whether the disputes between them fall within the scope of the arbitration clause set in Section 9 of the Internet Advertising Agreement. To determine whether factor 4 is satisfied, courts look at the "factual allegations" underlying the claims in the complaint. Dialysis Access Center, 638 F.3d at 378. They have consistently recognized that, given the preference for arbitration embodied in the FAA, arbitration clauses "should be interpreted broadly." Soto-Álvarez v. Am. Inv. & Mgmt. Co., 561 F.Supp.2d 228, 231 (D.P.R. 2008)(citing in part Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62 (1995)). An order to arbitrate should not be denied unless it may be said with positive assurance that the arbitration clause "is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582-83 (1960). In the absence of any express provision excluding a particular grievance from arbitration, "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." Id. at 584-85.

From the general to the particular, in this action International alleges that it has complied with the terms of the Payment Contract Agreement by paying all "valid invoices" but that AP breached the agreement by overbilling for its services and further breached its obligations "by listing Purple Heart as the first moving company [on consumeradvocate.org] listing and making false representations to customers regarding its reputation complaint history and other factors,

---

[5] That is, the parties do not dispute that a valid agreement to arbitrate exists. See, Docket No. 11 at p. 8 and Docket No. 1 at p. 5 (whereby the parties concede they entered into the Advertising Agreement and that this agreement contains an arbitration clause). As to factors 2 and 3, the parties also concede that AP is entitled to invoke the clause as a signatory of the agreement containing the arbitration provision and that is bound by the clause. Id. See also, Docket No. 16 at p. 2 (acknowledging the parties are "virtually in agreement" as to all facts and events, but the divergence lies in whether the arbitration clause covers the dispute between them or the Payment Agreement rendered ineffective the arbitration clause included in the Internet Agreement). What is more, International does not dispute that the arbitration clause included in the Internet Advertising Agreement applies to the parties' relationship. Rather, it argues that said clause is not in effect or does not extend to the issue now before the court.

thereby causing damages to [International] in an amount to be over $750,000.00," due to the "significant decrease in leads generated when International was top listing on AP's website" (Docket No. 1 at ¶¶ 37-39, 67-68). Thus, it is apparent that the allegations center around the advertising relationship between International and AP and the amounts due for services rendered, matters that the Internet Agreement itself covers, for it specifically requires that "[a]ll claims arising out of *or relating* to this Agreement and/or *the Services* will be resolved by arbitration" (Docket No. 1-1, p. 5, Section 9.1)(emphasis added).

International contends that the claims related to the arbitration that AP commenced and that are included in this action *do not* arise out of or are related to the Internet Advertising Agreement but to the subsequent Payment Agreement Contract, which lacks an arbitration clause and expressly provides for other methods of dispute resolution (Docket No. 9, pp. 3, 6-10). Yet the Arbitration Demand belies International's contention, as it is clear that AP is alleging a single cause of action against International: breach of the Internet Advertising Agreement for nonpayment of fees owed to AP under the agreement and the insertion orders. In fact, International itself is alleging in the instant case a breach of the advertising obligations under the Internet Advertising Agreement as it relates to Purple Heart and requesting damages for that breach. The subsequent Payment Agreement Contract entered into by the parties does not alter this conclusion, as its purpose was to *facilitate* the *ongoing* provision of services by AP under the Internet Advertising Agreement (Docket No. 1-2), by the parties agreeing on "a payment plan for the *outstanding balance* of $79,632.50" as provided for therein. Id. Mere modification of the payment terms is completely consistent with the advertising agreement.

International posits that the Payment Agreement Contract constituted an extinctive novation that somewhat "negated" the agreement to arbitrate included in the Internet Advertising

Agreement (Docket No. 16). Novation is the substitution of a new obligation for an existing obligation by the mutual agreement of the parties. See, Black's Law Dictionary (10th Ed. 2014)(defining term). Puerto Rico law recognizes two types of novation: extinctive and modificatory. See, Articles 1182-1184 of the Puerto Rico Civil Code, Law No. 55 of June 1, 2020; Web Service Group, Ltd. v. Ramallo Bros. Printing, Inc., 336 F.Supp.2d 179, 182 (D.P.R. 2004)(discussing topic); I-II José Puig Brutau, Fundamentos de Derecho Civil, at 388-407 (4th ed. 1988)(similar).[6] A modificatory novation modifies the original agreement while the other type of novation extinguishes the old obligation and creates a new one. Id. To extinguish an obligation, the parties must have explicitly agreed to the extinction, or there must be an absolute incompatibility between prior and subsequent obligations. See, Ramallo Bros. Printing, Inc., 336 F.Supp.2d at 182 (explaining distinction).

International cannot direct the court's attention to any contractual language showing that the parties conclusively stated that the first contract was cancelled and substituted by the second contract to extinguish their obligations under the Internet Advertising Agreement. The Payment Agreement Contract expresses that it was the parties' intention to agree on a payment plan for the outstanding balance due *under* the Internet Advertising Agreement *in exchange for continued services as a partner on ConsumersAdvocate.org*. And modifications that are mainly quantitative in nature such as occurred in this case, do not extinguish the original main obligations in a contractual relationship. See, Kellogg USA v. B. Fernández Hermanos, Inc., 2010 WL 376326, *8-*10 (D.P.R. January 27, 2010)(analyzing issue while noting that in Warner Lamber v. Corte Superior, 101 P.R.Dec. 378 (1973) a case under the Dealers Act of Puerto Rico, Law 75 of June

---

[6] Section 10.5 of the Agreement provides that it shall be governed and construed in accordance with the laws of Puerto Rico (Docket No. 1-1, p. 6).

24, 1964, P.R. Laws Ann. tit. 10 §§278 et seq., the Supreme Court of Puerto Rico rejected the argument that a post-Law 75 modification which increased the commission fixed in the dealer's contract, without more, resulted in extinguishing the pre-Law 75 obligations).[7] One conclusion follows: the claims before the court fall within the scope of the arbitration provision of the Internet Advertising Agreement and must be submitted to arbitration.[8]

### III. CONCLUSION

Given that the issues raised in this action are arbitrable, the parties must submit them to arbitration. And because no live controversies will remain before this court, retaining jurisdiction and staying the action would serve no purpose. See, Caguas Satellite Corp. v. Echostar Satellite LLC, 824 F.Supp.2d 309, 316-317 (D.P.R. 2011)(so noting); Soto-Álvarez v. American Investment and Management Company (AIMCO), 561 F.Supp.2d 228, 230 (D.P.R. 2008) (granting motion to compel arbitration and dismissing complaint).[9] Therefore, the complaint must be, and is hereby DISMISSED. Judgment shall be entered accordingly.

---

[7] In any event, see, Biller v. S-H Opco Greenwich Bay Manor, LLC, 961 F.3d 502, 512 (1st Cir. 2020)(explaining why, even if the agreement terminated, that would not mean that the agreement to arbitrate included therein lapsed with it, inasmuch as the arbitration clause is presumed to be severable from the remainder of the contract).

[8] Although not fully elaborated, International also alludes to Section 10.5 of the Internet Advertising Agreement, which provides that the parties "agree[d] to submit to the exclusive jurisdiction of the federal or state courts of the Commonwealth of Puerto Rico for disputes arising under or relating to this Agreement" (Docket Nos. 1, p. 5 and 1-1, p. 6). While it does not argue that this Section negates the arbitration clause, it seems to suggest that the forum selection clause it somehow inconsistent with the parties' intention to arbitrate. But this argument is simply too bare-bones and underdeveloped for the court to be able to properly evaluate it. See, United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones"). At any rate, as correctly noted by AP, Clause 10.5 can be readily interpreted to provide the judicial forum for litigation over the arbitrability of a dispute (such as this case) and litigation to confirm or vacate any award resulting from the arbitration required under Section 9.1 of the Advertising Agreement. See, e.g., UBS Fin. Servs. v. Carilion Clinic, 706 F.3d 319, 329 (4th Cir. 2013) (concluding that forum selection clause did not necessarily preclude arbitration because, among other things, "a court plays a role in arbitration proceedings by compelling the arbitration and enforcing any arbitration award").

[9] AP states that the court should grant it fees in bringing its motion, on the basis of Section 10.9 of the Advertising Agreement, which provides that "[t]he prevailing party in any dispute arising from or related to this Agreement shall in addition to all damages awarded, be entitled to an award of reasonable fees and costs" (Docket No. 11, p. 16). The Section appears to condition award of contract-related fees on damages being awarded, which has not occurred. In

**SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of June, 2021.

s/Pedro A. Delgado Hernández
PEDRO A. DELGADO HERNÁNDEZ
United States District Judge

---

any event, AP does not cite authority or caselaw supporting a different reading of Section 10.9. Correspondingly, the request for fees is denied.